568

IN THE MATTER OF THE APPLICATION OF WAL-
TER EDWARD EKLUND TO REGISTER TITLE
TO REAL PROPERTY SITUATE AT PAHOEHOE
3RD AND 4TH, NORTH KONA, HAWAII, STATE
OF HAWAII.

Nos. 4513 AND 4514.

FEBRUARY 18, 1970.

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON, JJ., AND
CIRCUIT JUDGE M. DOI IN PLACE OF KOBAYASHI, J.,
DISQUALIFIED.

OPINION OF THE COURT BY MARUMOTO, J.

These appeals, Nos. 4513 and 4514, are appeals from two separate decrees of the land court entered in Land Court Application No. 1781 of Walter Edward Eklund to register title to four parcels of land in North Kona, Hawaii, designated as Lots 1-A, area 2,949 square feet; 2-A, area 23,883 square feet; 1-B, area 109 square feet; and 2-B, area 12,209 square feet. In No. 4513, the State of Hawaii appealed from the decree which granted the application with respect to Lots 1-A and 2-A. In No. 4514, Eklund appealed from the decree which denied the application with respect to Lots 1-B and 2-B.

Eklund traced his title to Grant 1927 to Kipapa and Grant 2034 to Kaupehe, and claimed Lots 1-B and 2-B as parts of Grant 1927 and Lots 1-A and 2-A as parts of Grant 2034.

Grant 1927 was a grant of a part of Pahoehoe 3, and was made on December 20, 1855. Grant 2034 was a grant of a part of Pahoehoe 4, and was made on May 21, 1856.

At the time Grant 1927 was made, there was in existence in Pahoehoe 3 a kuleana award, being Land Commission Award 4705 to Moopuu. However, Royal Patent 4221 on the award was not issued until November 17, 1858.

Grants 1927 and 2034 were in Hawaiian. Grant 1927 described the land granted therein by monuments, courses, and distances identical with the survey description of a part of Pahoehoe 3 prepared by John Fuller, a surveyor, on February 20, 1855. Grant 2034 also described the granted land by monuments, courses, and distances identical with the survey description of a part of Pahoehoe 4 prepared by Fuller on the same day. Fuller's survey descriptions were in English.

In addition to the survey description, Grant 1927 contained a sketch of the outer boundaries of the granted land, drawn to a scale of 4 chains to 1 inch. So did Grant 2034. The sketches were exact copies of the sketches drawn by Fuller.

Lot 1-A lies between Alii Drive and the old government road, and Lot 2-A lies between the old government road and the sea, in Pahoehoe 4. Lot 1-B lies between Alii Drive and the old government road, and Lot 2-B lies between the old government road and the sea, in Pahoehoe 3.

The drawing appended hereto, designated as Map 1, shows Pahoehoe 3 and Pahoehoe 4; Grants 1927 and 2034; Royal Patent 4221; Alii Drive; old government road; and Lots 1-A, 2-A, 1-B, and 2-B. Fuller's survey descriptions are copied next to Map 1. Map 2 is a reproduction on a reduced scale of the sketch in Grant 1927 and the sketch in Grant 2034, as juxtaposed against each other. The numbers in parentheses on Map 1 are the course numbers of the survey description in Grant 1927, other than course 12. The numbers in brackets are the course numbers of the survey description in Grant 2034, other than course 9. Course 12 of Grant 1927 and course 9 of Grant 2034 were seaward courses. These courses are not numbered on Map 1 because their location is in controversy. The line on Map 1 designated as the Dunn line is the line delineated by State surveyor James Dunn as the seaward boundaries of Grants 1927 and 2034.

The land court entered the decree which registered title to Lots 1-A and 2-A in Eklund pursuant to its decision that the meandering coastline at high water mark constituted the seaward boundary of Grant 2034. That decision placed Lots 1-A and 2-A within Grant 2034, as claimed by Eklund.

The court denied registration of title to Lot 1-B on the ground that the parcel is a part of Royal Patent 4221 to which Eklund has no color of title, and not a part of Grant 1927. It denied registration of title to Lot 2-B pursuant to its decision that Grant 1927 did not extend below the old government road. The effect of the decision was

## SURVEY DESCRIPTIONS PREPARED BY J. FULLER

**PART OF PAHOEHOE 3:** Begin at west corner of this lot at east corner of a wall surrounding a spring of water, and run (1) N 64° E 3.12 chs. through Kumukahi's house; (2) N 78° E 6.77 chs. along the boundary of Pahoehoe 2; (3) N 74° 15' E 7.60 chs. along the boundary of Pahoehoe 2; (4) N 87° E 4.47 chs. along to great wall N corner thence; (5) S 10° 15' E 3.90 chs. along the great wall to E corner thence; (6) S 78° 45' W. 3.86 chs. along the Kuamoo; (7) N 86° 30' W 2.80 chs. along the Kuamoo; (8) S 87° 30' W 6.85 chs. along the Kaupehe's land; (9) S 63° W 2.02 chs. along the Kaupehe's land; (10) S 78° 15' W 1.30 chs. along the Kaupehe's land cattle pen; (11) S 67° W 3.25 chs. along the Kaupehe's land to S corner; (12) N 40° 15' W 2.50 chs. along the Landing to point of beginning and containing 6½ acres.

**PART OF PAHOEHOE 4:** Begin at south corner at sea side adjoining Laaloaiki, a heap of stones, and run (1) N 76° E 1.74 chs. to mauka side of road thence; (2) N 69° E 4.27 chs. along the ancient boundary of Laaloaiki; (3) N 68° 15' E 10.50 chs. along the ancient boundary to East corner; (4) N 86° 30' W 2.80 chs. along the ancient boundary Pahoehoe 3; (5) S 87° 30' W 6.85 chs. along the ancient boundary Pahoehoe 3 (Kipapa's); (6) S 63° W 2.02 chs. along the ancient boundary Pahoehoe 3 (Kipapa's); (7) S 78° 15' W 1.30 chs. along the ancient boundary Pahoehoe 3 (Kipapa's); (8) S 67° W 3.25 chs. along the ancient boundary to sea (9) S 11° 30' E 250 chs along the Landing place to point of beginning and containing 3¾ acres.

MAP 1

MAP 2

to place Lot 2-B outside of Grant 1927, and to leave it as unawarded government land.

In No. 4513, the State has not questioned Eklund's title to Lot 1-A and the portion of Lot 2-A which lies between the old government road and the Dunn line. The position of the State is that the seaward boundary of Grant 2034 was along the Dunn line, and the portion of Lot 2-A which lies between the Dunn line and the sea is unawarded government land.

In No. 4514, the title to Lot 1-B is not in issue. Eklund has not raised any question regarding the denial of registration of title to that parcel. Eklund's position is that the decree appealed from is in error in denying his application with respect to Lot 2-B inasmuch as Grant 1927 extended to the sea, as in the case of Grant 2034. The State supports the decree here. However, in the land court, it contended that the seaward boundary of Grant 1927 was along the Dunn line, and claimed that it had title to the portion of Lot 2-B between the old government road and the Dunn line by dedication or adverse public use.

Having stated the facts and the contentions of the parties, we shall move on to a consideration of the questions for decision. In No. 4513, there is but one question. That question is the location of the seaward boundary of Grant 2034. In No. 4514, there are two questions, the second being dependent on the answer to the first. The first question is the location of the seaward boundary of Grant 1927. If the answer to that question is that the seaward boundary was below the old government road, the second question arises as to whether Eklund has any registrable title to any portion of the land which lies below the old government road.

We will consider the questions in No. 4514 first. The land court decided that the seaward boundary of Grant

1927 did not extend below the old government road for the following reasons:

1. The grant described its north boundary as running from the east corner of the stone wall surrounding a spring of water (a point at the seaward edge of the old government road, which will hereafter be referred to as the initial corner), along courses 1, 2, 3, and 4, to the Great Wall, a well known survey monument in North Kona; and the south boundary as running from the Great Wall, along courses 6, 7, 8, 9, 10, and 11, to a point described as the south corner at the end of course 11. It stated the distance of the north boundary to be 21.96 chains, or 1,449.36 feet, and the distance of the south boundary to be 20.08 chains, or 1,325.28 feet. The actual distance between the initial corner and the Great Wall was approximately 40 feet longer than the distance stated in the grant, and, if the north boundary were measured a distance of 1,449.36 feet from the Great Wall, it would not reach the old government road. Similarly, if the south boundary were measured a distance of 1,325.28 feet from the Great Wall, it would not reach the old government road.

2. Land Commission Award 4705, which was in existence at the time of the grant, covered substantially the entire width of Pahoehoe 3 immediately above the old government road. From this fact, the court concluded that a grant of any land below the award was not intended.

3. The grant described the seaward course as running "along the landing place inland from the seashore to a point of beginning". The court thought that the words which placed the seaward boundary inland of the seashore should be given meaning and effect.

We think that the land court erred. Our reasons for so thinking are as follows:

First, the decision ignored the initial corner. That was a fixed survey monument, the location of which was not

in dispute. The general rule is that fixed monuments prevail over courses and distances, 1 -Patton, *Land Titles,* 396, § 150 (2d ed. 1957) ; *Ookala Sugar Co.* v. *Wilson,* 13 Haw. 127, 132 (1900). A difference of 40 feet in the distance of the north boundary, as stated in the grant and as measured on the ground, is too insignificant a difference to prevent the application of the general rule.

Second, the sketch contained in the grant showed the south point as being located below the old government road. The sketch may properly be referred to in ascertaining the intention of the grantor. A map referred to in a grant for the purpose of identifying the granted land is a part of the grant itself. F. E. Clark, *On Surveying and Boundaries* 339, § 312 (3d ed. 1959) ; *Ferris* v. *Coover,* 10 Cal. 589 (1858). *A fortiori,* a sketch contained in a grant is a part thereof.

Third, the existence of Land Commission Award 4705 immediately above the old government road did not negate an intention to grant below the road. The sketch clearly showed that the grant extended below the road. The omission of any reference in the grant, or the sketch, to the award is explainable by the fact that the royal patent on the award had not been issued at the time the grant was made.

Fourth, the fact that the grant described the seaward course as running inland from the seashore did not necessarily mean that the seaward boundary was above the old government road. It is possible to give meaning and effect to the words which placed the seaward boundary inland from the seashore by locating the boundary below the road but above the seashore. The sketch showed that such was the intention.

Eklund's position that the seaward boundary of the grant extended to the sea is based solely on the testimony of his surveyor that "if 2034 called for kahakai, 1927 must

be at the kahakai." That position is without merit. In the quoted testimony, the surveyor assumed that the word "kahakai" always means high water mark. It will be shown later in this opinion that the word is also used to mean the general area bordering the sea. Another reason that Eklund's position is without merit is that the grant called for its seaward course to run not along kahakai, but "iuka," or inland, of kahakai.

In our opinion, the seaward boundary of the grant was along the Dunn line. Dunn delineated the line by reversing the call for course 12, the seaward course, which was "North 40° 15' West 2.50 chains" from the south corner to the initial corner. That is, he ran a line from the initial corner toward the south boundary of the grant by reversing the bearing stated in the call. He did so because the survey did not close by following the calls in the grant. The line so drawn met course 11 at a point 4.25 chains seaward of the intersection of courses 10 and 11, and was 32 feet longer than the distance of 2.50 chains stated for course 12. The distance of course 11, as stated in the grant, was 3.25 chains. However, a scaling of course 11 on the sketch showed that the distance was approximately 4.25 chains. So, Dunn concluded that the stated distance of 3.25 chains was a mistake, and located the south corner at the point where the seaward course drawn by him met course 11. He added 32 feet to the distance stated for course 12 in order to close the survey.

The procedure followed by Dunn is entirely in order. It is stated in *Ookala Sugar Co.* v. *Wilson, supra* at 131, that "in construing a grant and locating the land all parts of the grant must be considered, and that mistakes in certain calls may be corrected when shown to be mistakes by other calls taken in connection with the land." A call in a grant may be reversed and a line traced in an opposite direction, whenever by doing so the boundaries will most

nearly harmonize with the calls and monuments of the grant. *Ayers* v. *Watson,* 137 U.S. 584, 604 (1891). Also, distance may be extended or contracted, if such procedure will close the survey and leave all identified corners intact. 1 Patton, *supra* at 408, § 154; *Pearson* v. *Baker,* 34 Ky. 321, 323 (1836).

The land court provided for the contingency that this court might determine that the grant extended below the old government road, by entering two supplemental decisions which would apply in such event. In the first decision, it found that no part of the grant below the road was dedicated to the public *"except* the passageway delineated by the two stone walls at the North end," and, in the second, it found that Eklund has title to 70.4705 per cent undivided interest in the part of the grant below the road. The supplemental decisions are supported by evidence. We cannot say that they are clearly erroneous.

We turn now to a consideration of the question in No. 4513. The decision of the land court that the meandering coastline at high water mark constituted the seaward boundary of Grant 2034 was based upon the following:

The grant described its south boundary as beginning at "ahupohaku," or a heap of stones, at south corner at kahakai adjoining Laaloaiki, and running up along courses 1, 2, and 3, to the topmost end of Pahoehoe 4, marked "Apex" on Map 1; the north boundary as coming down from the apex, along courses 4, 5, 6, 7, and 8, to a point described as "kakahiaka" at the seaward end of course 8; and the seaward boundary as running from kakahiaka, "ma ke palena kahakai," to the point of beginning. Kakahiaka means morning, and did not make any sense in the context in which it was used. So, the court concluded that a mistake was made, and that kahakai was intended. It then assumed that, as used in land descriptions, kahakai

always meant high water mark, and translated ma ke palena kahakai to mean along the high water mark. It stated:

"In my opinion, Grant 2034 ran to the sea and along high water mark. I find that 'kakahiaka' was and is an error for 'kahakai.' This is confirmed by the Fuller survey which says in English 'to sea.' I find that the final azimuth and distance were the usual surveying references given for a meandering boundary and were not intended to modify the meaning of 'ma ke palena kahakai,' which I find means along high water mark."

Here too, as in Grant 1927, we think that the land court erred. The basic fallacy in the decision lies in the assumption that kahakai invariably means high water mark. That assumption is predicated on the holding in *Halstead* v. *Gay,* 7 Haw. 587, 589 (1889), that the word, as used in the survey in that case, meant "high-water mark on the sea beach." However, depending on context, kahakai has a broader meaning as "region of country bordering on the sea."[1] Andrews, *Dictionary of the Hawaiian Language* 235 (1865). There is a recognition of this broad meaning in *Halstead,* at page 589, where, after discussing the etymology of the word, this court stated: "By extension of the term beyond its strictest etymological meaning, it means the seashore, the sand of the beach, and still further the region of country bordering on the sea."

In the discussion below, we will refer to the beginning point of Grant 2034 as ahupohaku and the seaward end of course 8 as kakahiaka.

We think that in Grant 2034 kahakai was used in its broad sense, for the following reasons:

---

[1] Holmes, J., in *Towne* v. *Eisner*, 245 U.S. 418, 425 (1918) : "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."

1. No monument indicating ahupohaku could be found. The grant described course 1 as running a distance of 1.74 chains, or 114.84 feet, from ahupohaku to the mauka, or upper, side of the road. The land court found that the old government road was in the same location as set forth in the map filed with the application. That map shows the distance between the mauka side of the road to the high water mark to be 211.81 feet. If course 1 were measured a distance of 114.84 feet from the mauka side of the road, it would end 96.97 feet short of high water mark.

2. The sketch contained in the grant showed the seaward boundary to be above the sea and the distance of course 1 to be approximately as stated in the grant.

3. From the description in the grant, it is clear that kakahiaka was at the same location as the south point in Grant 1927, which lay definitely inland of the sea.

4. Fuller's survey description which was copied in the grant, after being translated into Hawaiian described a *part*, and not the whole of Pahoehoe 4. The description covered the entire upper portion of Pahoehoe 4 to the apex. From this, it may be inferred that the portion omitted was the area bordering the sea, and that the seaward boundary was above the sea.

If the seaward boundary of the grant was not along the meandering coastline at high water mark, as determined by the land court, then where was the boundary located?

Under the description in the grant, the seaward boundary ran from kakahiaka to ahupohaku. We have already determined the location of kakahiaka. The problem at hand is the ascertainment of the location of ahupohaku.

Dunn determined the location of ahupohaku by starting from kakahiaka and following the call in the grant for course 9, which was "South 11° 30′ East 2.50 chains,"

to the common boundary of Pahoehoe 4 and Laaloaiki 1. Inasmuch as the distance from kakahiaka to such common boundary was approximately 30 feet longer than the distance of 2.50 chains stated in the call, he extended the line to reach the common boundary. Under this procedure, the point at which the extended line met the common boundary would be the location of ahupohaku.

We think that ahupohaku could be more accurately located by a reverse plotting of course 1 than by following the procedure used by Dunn. By reverse plotting, ahupohaku would be 114.84 feet seaward on course 1 from the mauka side of the old government road. The mauka side of the government road could be readily ascertained, and the distance of 114.84 feet is a definite distance.

There is a greater margin of error in locating ahupohaku under the procedure used by Dunn because directional calls in the early grants were frequently unreliable, as stated in the literature on old Hawaiian surveys. The unreliability stemmed from the erratic behavior of the magnetic needle which was used in the early surveys. See Arthur C. Alexander, *Land Titles and Surveys in Hawaii* 73 (1920) ; Curtis J. Lyons, *A History of the Hawaiian Government Survey with Notes on Land Matters in Hawaii* 44 (1903).

We hold that ahupohaku was located at a point 114.84 feet seaward on course 1 from the mauka side of the old government road, and that the seaward boundary of the grant was along a line drawn from kakahiaka to ahupohaku, as so located. This holding places ahupohaku at a point approximately 10 feet seaward of the point located by Dunn.

An explanation may be in order as to why we follow the Dunn line as the seaward boundary in Grant 1927 and not in Grant 2034. In Grant 1927, the procedure used by Dunn placed the south corner at the same spot indicated

in the sketch as the location of that corner, and best harmonized the calls and monuments of the grant, as well as the information disclosed in the sketch. In Grant 2034 too, the procedure used by Dunn closely harmonizes the relevant information in the grant and the sketch. However, the procedure we have followed also harmonizes the relevant information closely, with the probability of lesser margin of error, as explained above.

Reversed, with direction to enter a decree in accordance with this opinion.

*Merrill L. Carlsmith* (*Carlsmith, Carlsmith, Wichman & Case* of counsel), *Frank D. Gibson, Jr.,* (*Henshaw, Conroy & Hamilton* of counsel), and *Robert G. Hogan* (*Hogan, Howell & Rother* of counsel) for applicant.

*Andrew S. O. Lee,* Deputy Attorney General (*Bertram T. Kanbara,* Attorney General), for respondent.