# CITY COUNCIL OF THE CITY AND COUNTY OF HONOLULU *v.* FRANK F. FASI, MAYOR OF THE CITY AND COUNTY OF HONOLULU, ET AL.

## No. 4945.

APRIL 3, 1970.

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON
AND KOBAYASHI, JJ.

OPINION OF THE COURT BY MARUMOTO, J.

In a complaint filed in the first circuit court against the mayor of the city and county of Honolulu, its managing director, director of finance, and the director of

parks and recreation, the city council sought a judgment mandating the defendants to comply with Resolution No. 436 (1969), and enjoining them from acting in any manner contrary to the resolution.

Resolution No. 436 requires the director of finance to offer the Queen's Surf property at public auction as a restaurant and night club concession for ten years from January 1, 1970. The Queen's Surf property is a part of Kapiolani Park in Waikiki, and is city and county property within the jurisdiction and control of the department of parks and recreation.

The circuit court denied the relief sought, and dismissed the complaint. The case is here on the council's appeal from that dismissal.

The appeal presents a question as to whether Resolution No. 436 establishes a policy which the director of finance is required to follow under section 5-403 (k) of the city and county charter, which reads as follows:

"Section 5-403. Powers, Duties and Functions. The director of finance shall be the chief accounting officer of the city and shall: * * * (k) Rent or lease city property except property controlled by the board of water supply, and award concessions, pursuant to policies established by the council."

There are two aspects to the question. The first aspect is whether Resolution No. 436 establishes a policy; and the second is, if it establishes a policy, whether the policy so established is the kind of policy which the director of finance is required to follow.

The attorney for the council has argued to this court that, although the word "policy" is commonly used to refer to decisions of broad and general applicability, such common usage is technically incorrect; that policy is any determination which involves an exercise of judgment; that Resolution No. 436 embodies the judgment of the

council that the location mentioned in it should be let out for a restaurant and night club concession; and that, consequently, the resolution establishes a policy.

The argument is not without some semantic plausibility. However, we think that, in the context of section 5-403(k), policy means a determination much broader than an ad hoc command to take specific action with regard to a particular piece of property, and has reference to requirements set up by the council to serve and protect the public interest which are generally applicable to the leasing or renting of any city and county property, or the awarding of concessions thereon. Be that as it may, even if we accept the argument, it touches only upon the first aspect of the question, and not upon the second.

The second aspect of the question should be considered in the light of the basic scheme of the charter. In this connection, the following statement of Holmes, J., in *Towne* v. *Eisner*, 245 U.S. 418, 425 (1918), which we recently referred to in *In re Application of Eklund*, 51 Haw. 568, 465 P.2d 552 (1970), is relevant: "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."

The charter has as its basic scheme a clear and definite separation of the legislative power and the executive power of the city and county, vesting the former in the legislative branch represented by the council and the latter in the executive branch headed by the mayor. Under the separation of powers so provided, each branch is coordinate with the other, and neither may exercise the power vested in the other. However, this does not mean that the wall of separation is complete and either branch is free to exercise its power as it pleases without any say by the other. *Cf. In re Koki*, 25 Haw. 406, 410 (1920); *Koike* v.

*Board of Water Supply,* 44 Haw. 100, 113, 352 P.2d 835, 843 (1960).

The charter contains a number of provisions which grant to one branch some voice with regard to the actions of the other. The mayor's veto power is an example. So is the council's policy-making power, which is implied in section 5-403 (k).[1]

It is evident from a careful reading of the charter, together with the reports of the charter commission, that such provisions were not designed as departures from the principle of separation of powers to enable one branch to exercise some power vested in the other, but are safeguards against improvident legislative or executive actions.

For instance, the mayor's veto power does not enable the mayor to legislate. Its function is to prevent precipitate action on any proposed legislative measure which the mayor may deem not to be in the public interest by having the council take a good second look at the measure before it becomes law.

Likewise, the council's policy-making power mentioned in section 5-403 (k), properly construed, is not a departure from the principle of separation of powers, but is a provision to enable the council to set up requirements, which it may deem to be in the public interest, to be observed by the executive departments in exercising their powers with respect to leasing, renting, and awarding concessions on city and county property under their control.[2]

---

[1] The charter does not contain any provision which expressly vests the council with any policy-making power. The existence of the power is only implied from the use of the phrase, "pursuant to policies established by the council," in section 5-403(k), and also in section 5-403(j). Section 5-403(j) provides that the director of finance shall "dispose of movable property not needed by any agency of the city pursuant to policies established by the council."

[2] The history of section 5-403(k) shows that the policy-making power is not a part of the legislative power vested in the council. An early draft of the provision, which later became section 5-403(k), provided that the director of finance shall "Award all concessions which may be

In this connection, the statement regarding the functions of the director of finance in the final report of the charter commission is significant. There, the commission stated that the director of finance is an officer "concerned with the staff functions of treasury, accounting, purchasing and other centralized services for all departments, all as outlined in more detail in section 5-403." The significant language in the statement is the phrase "centralized services for all departments." There can be no question that among such centralized services are the services required in carrying out the decisions of the executive departments to lease, rent, and award concessions on property under their control. The council is not a department of the city and county, and, consequently, service to it is not among the functions of the director of finance.

We conclude from the language of section 5-403(k), read in the light of the abovementioned statement of the charter commission, that the procedure involved in leasing, renting, or awarding a concession on city and county property is a two-step process. The first step is the making of a decision by the department in control of the property to lease, rent, or let it out as a concession, subject to the established policies of the council, as defined in this opinion; and the second step is the carrying out of that decision by the director of finance, also subject to the established policies of the council.

authorized on City property except property controlled by the Board of Water Supply, subject to the requirements that may be imposed by ordinance." The final draft substituted the phrase "pursuant to policies established by the council" for the phrase "subject to the requirements that may be imposed by ordinance." Under the charter, the council exercises its legislative power by ordinance. Section 3-201 provides: "Every legislative act of the council shall be by ordinance. Non-legislative acts of the council may be by resolution and except as otherwise provided, no resolution shall have force or effect as law." The final draft of section 5-403(k), which dispensed with the requirement of ordinance, made policy-making a non-legislative act which may be exercised by a resolution. Although the policy-making power is thus non-legislative, we think that it should be given meaning and effect by making any policy established thereunder binding upon the director of finance, provided it comes within the meaning of that word as defined in this opinion.

8

The first council elected under the charter published on January 12, 1960, ten days after it took office, a policy declaration, which is printed as Appendix "D" in Revised Ordinances of Honolulu 1961. The declaration dealt with matters looking to prevention of contracts which encumber city and county property for long periods, avoidance of favoritism in the selection of tenants, obtaining of fair rental, assurance that tenants are financially qualified and are able to perform their contract obligations, and similar matters of public concern. It has been amended from time to time after the original publication, but all amendments made before the adoption of Resolution No. 436 were either amendments of original provisions or addition of similar requirements as the original.

The original declaration and amendments made before Resolution No. 436 contain the kind of policies contemplated in section 5-403(k) and required to be followed by the director of finance under that section.

Resolution No. 436 is quite different. In form, it amends the original declaration by adding a new part designated as "Special Provisions Governing Concessions in the Queen's Surf Property." But, in substance, it is an outright usurpation and exercise of executive power.

The executive power involved here is the power to decide whether to permit or not to permit a concession on park property. That power belongs to the department of parks and recreation, which, under section 6-603(a) of the charter, has the power to "plan, design, control, maintain and operate all parks and recreational grounds, facilities and programs of the city." The power to plan and operate implies the power to decide whether a concession should be permitted, for the allowance or disallowance of a concession has a material bearing on the planning and operation of a park.

Because Resolution No. 436 provides for the exercise by the council of executive power which is inconsistent

with the principle of separation of powers, we hold that it does not establish the kind of policy which the director of finance is required to follow under section 5-403(k).

The foregoing holding makes it unnecessary for this court to consider the other questions raised by the council on this appeal.

The council says that the power of decision as to allowance or disallowance of concessions on park property resides with it as the residual depository of all of the powers of the city and county, and not with the department of parks and recreation, because section 5-403(k) does not expressly reserve to that department the power which the pre-charter board of parks and recreation had under R.L.H. 1955, § 151-15, to "lease or rent or grant, to citizens only, concessions in any park or playground areas or improvements that may be deemed by it to be in the interest of the city and county."

Needless to say, the basic difficulty with the argument is that it ignores the principle of separation of powers. The power to decide whether to permit or not to permit a concession on any specific city property is not legislative, but executive in nature, to be exercised by the department which has control of the property. Another difficulty is that section 5-403(k) is not limited in its application to park property, but applies generally to all city and county property. Furthermore, to have reserved to the department of parks and recreation the power of the pre-charter board of parks and recreation would have run counter to the procedure for leasing, renting and awarding concessions on city and county property contemplated in the charter. The pre-charter board of parks and recreation had not only the power of decision as to allowance or disallowance of concessions but also the power to carry out its decisions by having its chairman or acting chairman execute the concession contracts in its own name. R.L.H.

1955, § 151-10. The omission of any reference in section 5-403 (k) to the power of the pre-charter board of parks and recreation only means that the function of executing concession contracts has been transferred to the director of finance, and does not mean that the power to make the basic decisions to permit or not to permit concessions has been denied to the department of parks and recreation.

On December 31, 1969, we issued an order permitting the present operator of the concession on the Queen's Surf property to continue its operation pending consideration of this appeal and until the further order of the court. That order will be terminated at midnight on May 31, 1970.

Affirmed.

*Richard P. Schulze, Jr.* (*Moore, Torkildson & Schulze* of counsel) for plaintiff-appellant.

*Paul Devens,* Corporation Counsel (*Wayne Luke,* Deputy Corporation Counsel, with him on the brief), for defendants-appellees.

---

### DISSENTING OPINION OF RICHARDSON, C.J.

I cannot agree with the positions taken by the majority of this court and the parties to this appeal.

The majority holding rests on a proposition which was not raised by the parties or the facts of this case. It warrants independent treatment. Therefore, I turn first to the positions taken by the parties to this appeal.

It is not controverted by the parties that the power to decide whether a park site should be used for concession purposes is a policy-making power. The pre-charter parks board was vested with the power to grant concessions when, in its discretion, it was "deemed . . . to be in the interest of the city and county." R.L.H. 1955 § 151-15.

The question presented is to which branch of government that power was committed under the charter. Since

the power is a policy-making power, it should reside in the policy-making body unless otherwise indicated. See City and County of Honolulu Charter, section 3-101. With regard to this question, the Council and the Mayor point to two apparently conflicting provisions in the charter.

The appellant City Council contends that section 5-403(k) establishes its policy-making power on all matters concerning concessions on park property. The command of that section is that the director of finance shall award concessions "pursuant to policies established by the Council." As a corollary of this proposition, the Council states that with the exception of policy-making power concerning concessions "the policy making powers over planning, design, maintenance and operation of parks which were previously lodged in the pre-charter Parks Board were transferred to the Mayor", by virtue of the general "powers" granted the director of parks by section 6-603(a).

The appellee Mayor does not contend that the power involved here is not a policy-making power. His argument is that "policies" in 5-403(k) does not establish the council's policy-making power over every matter concerning concessions but is limited to policy governing leasing and renting procedures applicable to all city property. The power to decide whether or not a particular park site is to be used for concession purposes is said to reside in the director of parks as incidental to the general "powers" to "plan, design, construct, maintain and operate all parks and recreational grounds, facilities and programs of the city." Section 6-603(a).

Neither party's interpretation is proper.

It should be noted that the charter commission did not generally deal with specific powers as such. See charter section 2-101. Rather it viewed the objects to be accomplished by government as "functions". The power regard-

ing each function was shared: The administrative power with regard to each function was to be exercised by the executive branch while the policy-making power with regard to each function was to be established and exercised by the legislative branch. As will be shown, this was the principle which guided the drafting of section 6-603(a).

Reference to the legislative history surrounding the drafting of the charter and the particular sections in issue clearly shows that the *whole* of the policy-making power of the pre-charter parks board was vested in the city council by the charter, not merely the policy-making power concerning concessions. Thus, the appellant Council's argument concedes too much. That history also reveals that the power exercised by the director of parks by virtue of section 6-603(a) is an administrative power. No policy-making power was granted the director of parks. Thus, the appellee Mayor's argument claims too much.

In summary, the intent of the commission in drafting section 6-603(a) was to vest the whole of the policy-making power of the pre-charter parks board in the council and to vest the whole of the administrative power of the pre-charter parks board in the mayor.

In relying on the legislative history of section 5-403(k), the council relies on too little. That section can be read for the proposition that the *administration* of the renting and leasing of concessions was transferred to the director of finance. However, there is no warrant in the language or the legislative history of that section which would conclusively establish that "policies" is used in the broad sense contended for by the Council or in the limited sense contended for by the Mayor and accepted by the majority of this court. In short, as will be shown, the record is inconclusive.

Assuming that "policies" in 5-403(k) is to be read in a limited sense, it is hardly relevant for that is not the

extent of the policy-making power of the council. As indicated above, the legislative history of section 6-603(a) clearly establishes that the whole of the policy-making power conferred on the pre-charter parks board was vested in the council by the charter, and under the charter only a policy-making power can be exercised to determine a policy question.

I

It is necessary to understand the basic scheme of the charter in order to give the sections their proper interpretation.

The commission's intent was to establish a form of government with a clear and definite separation of the policy-making power and the administrative power in government. Prior to passage of the charter, Honolulu had a "weak mayor" form of government. This meant simply that the mayor's administrative power was shared with the municipal legislative branch, see R.L.H. 1955 § 149-86, and with independent boards and commissions which established and administered their own programs. The advice given the commission by Dr. Charleton F. Chute, its official consultant, was that "if the strong-mayor form is decided upon, the power of the mayor should not be diluted by forcing him to share it with independent administrative boards and commissions. Nor should his powers be weakened by making members of the legislative body jointly responsible with the mayor in the field of administration." See letter dated January 30, 1957, file on Correspondence with Dr. Chute. The commission adopted his recommendation.[1] The charter provided for

---

[1] "[Y]ou may be interested to know that a strong-mayor form was decided upon—although not in so many words. The Commission authorized the drafting of provisions to limit the functions of the Council (the name of the legislative body is to be changed) to legislating and policy making. The office of the Mayor is to be greatly strengthened." Letter from Commission to Dr. Chute. (May 17, 1957)

"clear distinctions between legislative and executive functions of city and county government [with] ... basic policy formulation [vested in the council] and full jurisdiction for carrying out policy vested in the chief executive and his administrative organization." Report of the Honolulu Charter Commission (May 8, 1958) at 7.

Early in its deliberations, the commission had decided that the principle to be followed was "strong administration". See "Questionnaire. Guiding Principle for Development of New Charter"; Minutes, 18th meeting (May 11, 1956) for summary of each commission member's view. It was later noted that "consideration must be given to the distinction between legislation and administration in the assignment of powers and duties to the mayor and the council." See Memoranda 12 (July 19, 1956) and 15. "Administration [was] confined to carrying out established policies." Minutes, 34th meeting (August 13, 1956). The notes of the chairman of the commission state that "the office of the chief executive is strengthened by separation of administrative from legislative and policy-making functions." An example was the relocation of departments formerly controlled by boards and commissions in the executive branch. One of the independent boards which was relocated was the parks board.

The commission's approach to reorganization of the parks board under the charter was twofold: (1) in drawing up section 6-603(a) it was concerned with the proper location of the parks board's policy-making and administrative powers in the mayor-council form of government and (2) in drafting section 5-403(k) it was concerned with the problem of integrating the special fund status of park concession revenues with a centralized system of financial administration.

## II

The legislative history of section 6-603 (a) is considered first.

Prior to the charter's passage, the parks board was a semi-autonomous body established by the legislature, R.L.H. 1955, Chapter 151. The power of the parks board extended to the "control and management [of] all public parks, public recreation grounds and public playgrounds" and consisted of "full and complete authority . . . to manage, supervise, control and promote all programs relating to the *use* of . . . public recreation grounds" in addition to determining the need for additional park property and the care of trees, hedges and shrubs. Section 151-9 (emphasis added).

Section 151-15 left no doubt about the board's plenary power over the *use* of concessions in public parks: "The board of public parks and recreation may lease or rent or grant . . . concessions in any park . . . that *may be deemed by it to be in the interest of the City and County*" (emphasis added).

The board's status, as described above, was communicated to the commission. See letter from parks board to commission dated June 12, 1956. The organizational chart of the board, filed with the commission, places the power to "control and manage all public parks, public recreational grounds . . . to rent and grant concessions" in the board and the job of "conducting affairs of the Department, *interpreting and applying the policies of the Board,* making policies"[2] in the managing superintendent.

Thus, the board exercised the policy-making power itself. Through its superintendent, the board exercised the administrative power concerning, as the commission

---

2 "Making policies," as is clear by reference to the minutes of the 63rd commission meeting, referred to recommendations made by the superintendent to the parks board.

characterized it, the "park function".

It is necessary at this point to refer to the deliberations of the charter commission.

The first indication of the commission's attitude toward the autonomous status of the parks board was revealed about a month after receipt of the parks board's letter:

> Mr. Dodge [a member of the commission] believed that all administrative boards and commissions should be abolished, with the exception of temporary boards, in order to provide the best possible administrative structure and to permit citizens to know whom to go to with their problems . . . . Parks and Recreation should be purely advisory to the department head . . . .

> With regard to the above, Mr. Dodge was directed to draft provisions as stated, but that some provision be made to continue the functions of the present boards and commissions. Minutes, 29th meeting (July 10, 1956).

The draft provision referred to in the minutes was submitted at the 79th meeting discussed below and is the original draft of section 6-603(a).

At its 63rd meeting on March 18, 1957, the commission met with the parks board to discuss reorganization under the proposed charter. The parks board had proposed a more autonomous status, severing all ties with the mayor and the legislative branch. The superintendent of the parks board recommended that the parks board be continued as organized, with the possibility of acquiring additional revenue-raising powers that would give it the status of an authority. Minutes, 63rd meeting.

The chairman of the parks board also testified. He stated that the parks board was independent of the board of supervisors and that the supervisors could "override action only on the acquisition of lands for park use." The

superintendent was the "executive administering the functions of the parks board."

The minutes state that need for an autonomous parks board and its policy-making function was discussed at the meeting:

Several questions were asked having to do with how policy is determined by the Parks Board and how it affects the general public, for the reason that the Charter Commission members were trying to find a guidestick to determine if the existence of a board or commission is desirable and whether such policy-making functions might be significantly different from other agencies.

Mr. Lyons explained that his board has never had any trouble with the Board of Supervisors in the matter of establishing policy for handling park properties and in relationship to permits issued to the public on the use of parks properties. He explained that the Board of Supervisors has gone along with them in this respect, apparently feeling that this was all right. When questioned as to whether the administrator might make such rules and regulations, Mr. Lyons stated that it could be done by an administrator, explaining that he makes recommendations to the Parks Board from time to time.

At its 78th meeting held on July 22, 1957, the commission rejected the parks board's recommendation to establish a parks authority or to continue its existing status:

It was suggested that the administrative board be changed to an advisory board in connection with Parks and Recreation.

The Chairman asked whether the members felt that there should be a single headed department for Parks and Recreation with an advisory board. The Commis-

18

sion was in general agreement that this was desirable. Minutes, 78th meeting.

This decision was the same as that reached earlier at the 29th meeting and was in accord with the guiding principle of concentrating administrative powers in the executive branch and of continuing the functions assigned to the board in a single department head. Thus, the parks board was abolished, and the functions of the department were to be administered by a single department head.

The culmination of these deliberations was reached at the 79th meeting of the commission on July 29, 1957. It established that the intent of the commission was (1) to abolish the autonomous parks board; (2) to retain the administrative functions of the parks department in a single administrative head and (3) to transfer the policy-making power of the parks board to the legislative branch.

It was pointed out that a representative of the [parks] department had recommended that an "authority" for the function be created with taxing powers and other attributes of an authority.

Discussion brought forth statements that a board for the function could be justified only on the grounds that continuity of policy and planning is important for the proper operation of the department or if the parks and recreation function was new for the city and needed a "guiding hand" in the formative period of its growth.

*It was also brought out that a policy-making and administrative board for the [parks] function could no longer be justified because policymaking should be the prerogative of the legislative body and execution of policy, the prerogative of the administrative branch. Responsibility and accountability should not be diffused. (emphasis added.)*

It is evident that the issue of continuing the existence of a parks board raised at the 63rd meeting was resolved

at the 79th meeting. The issue posed at the 63rd meeting was "how policy is determined by the parks board and how it affects the general public for the reason that the ... members were trying to ... determine if the existence of a board ... is desirable." The commission concluded that the board was no longer necessary because "policy making should be the prerogative of the legislative branch."

The intent to transfer the policy-making power of the parks board to the city council was again reiterated in the chairman's notes:

The Council is strengthened and its responsibilities better clarified by: Elimination of some policy-making executive boards or commissions. Whereas the Board of Supervisors does not make policies in regard to the parks and recreation functions of the City and can only veto or override actions or policies of the planning commission, the Charter makes the Council the final policy maker in these areas.

It was at this same 79th meeting that a proposed draft of the provision which is now section 6-603(a) was introduced. The commission was still considering the second charter draft. The minutes state:

*Parks and Recreation.* Attached to the agenda for discussion purposes was a sample draft of a charter provision concerning the Parks and Recreation department. The draft reflected the commission's tentative decision to have a single-headed department to perform the functions of the department and have the present board act as an advisory committee if it is to be retained.

    \*      \*      \*      \*      \*      \*      \*      \*

It was agreed tentatively that the idea reflected in the draft is sound but it might be better to have a general statement of the department's function instead of an enumeration of specific duties and functions.

The terms "plan, design, construct, maintain and operate" refer to functions of the parks department and do not in any way connote grants of specific powers. The director of parks is assigned to the executive branch of government and can only exercise the power which resides in that branch. Section 4-101. And the executive power is limited to "carrying out established policies."

It only remains to conclude that the first mention of a department of parks and recreation appears in the third charter draft, the language obviously tailored to satisfy the recommendation made at the 79th meeting.[3] This became the language of the present section.

## III

The attempt to trace the origin of the clause "pursuant to policies established by the Council" in 5-403(k) is not, as counsel found, very rewarding. The legislative history of section 5-403(k) may be briefly summarized.

A major concern of the commission in adhering to a

---

[3] The sample draft attached to the agenda for the 79th meeting stated:

Department of Parks and Recreation. Function.

The Department of Parks and Recreation, headed by a Director, shall:

1. Plan, supervise, and conduct a comprehensive and coordinated program of cultural and physical recreation.

2. Promote cooperative planning with public and private agencies concerned with recreation.

3. Manage and operate all recreational facilities of the City.

4. Administer, control and manage all parks of the City.

5. Cultivate, place, maintain and remove trees, shrubs, flowers, grass and other plants on public grounds.

6. Embellish parks, parkways, highways and other public grounds.

7. Perform such other duties required by this Charter or assigned in writing by the Mayor.

The third charter draft stated that:

The department of parks and recreation shall:

1. Plan, design, construct, maintain and operate all parks and recreational grounds, facilities and programs of the City.

2. Plant, trim and maintain all shade trees, hedges and shrubs on public streets of the City.

3. Perform such other duties required by this Charter or assigned in writing by the Mayor. § 4-1003, Art. IV, Chapter 10 at 65.

mayor-council form of government was the need to cen-
tralize financial administration. One of the specific prob-
lems raised was the desirability of special funds set aside
from the general fund for a specific purpose. This was
the status of revenues from park concessions. R.L.H. 1955
§ 151-15.

The parks board's position was that the special fund
was essential to its operation but that it preferred the
power to tax rather than depend on the supervisors for
appropriations. See letter from parks board to commis-
sion, June 12, 1956.

Memorandum 45, prepared on March 15, 1957 for the
upcoming meeting with the parks board, reproduced only
that part of R.L.H. § 151-15 (the section which vested
sole discretion in the parks board for awarding conces-
sions) which concerned the deposit of concession revenues
in the general fund.[4] Thus, the provision concerning con-
cessions in the chapter on the finance department arose in
relation to the questions of continuing the special park
concession fund in a proposed scheme of centralized finan-
cial administration. The question of policy-making did not
arise in the minutes. The term "policies" first appears in
amendments to the six drafts of the charter.

Memorandum 29 re Fund Administration (November
30, 1956) was sent to the commission members. It stated
that one problem to be resolved by the commission was

---

[4] Memorandum 45 stated:

In addition to mandating a specified appropriation, the law ap-
pears to have created a special fund for the use of the agency.
Section 6774, R.L.H. 1945 as amended, (Now Sec. 151-15, R.L.H.
1955) an ambiguous if not vaguely written provision, says:

Income from operation of parks, playgrounds and recreational
facilities. . . . All revenues derived from concessions shall be de-
posited in the general fund of the city and county of Honolulu
and shall be appropriated by the board of supervisors for the use
of the board of public parks and recreation in addition to any
other appropriations required by law to be made for the board. Any
unexpended balances of such special revenues existing at the end
of any fiscal year shall be appropriated for the use of the board of
public parks and recreation during the next succeeding year.

that of "special revenue funds" earmarked or set aside from the general fund for a specific operating purpose. Representatives from the city and county controller's office called to testify before the commission, expressed their opposition to the special fund created for park concession revenues. Minutes, 48th meeting (December 3, 1956). According to the minutes, "the executive secretary pointed out that the commission might consider the provisions for fund administration in the New Orleans Charter, which he thought might adequately take care of the situation."

The first draft of the charter contained the original provision which is now section 5-403(k). It stated that the department of finance shall:

> Award all concessions on City and County property, (except property of the Parks Board) subject to requirements which may be imposed by ordinance. (Sec. 4-1301(s), N. O. Charter).

The parenthetical reference is to the New Orleans City Charter which was recommended by the executive secretary as a model at the 48th meeting. See above. Section 4-1301(s) of the New Orleans Charter states that the director of finance shall "award all concessions on City property subject to requirements which may be imposed by ordinance."

The third draft of the charter eliminated the exception of parks board property, previously contained in the first and second charter drafts, from the general power of the finance director to award concessions. Instead, board of water supply property was excepted.[5] This is consistent in view of the commission's decision not to preserve the independent status of the parks board. See Minutes, meetings 63, 78, 79. In contrast, the autonomous status of the

---

[5] The Director of Finance shall ... [a]ward all concessions which may be authorized on city property, except property controlled by the Board of Water Supply, subject to the requirements that may be imposed by ordinance.

board of water supply was continued under the new charter. See Charter, Chap. VIII.

The clause "subject to requirements which may be imposed by ordinance" was dropped and replaced by the clause "pursuant to policies established by the council" in the fourth charter draft. There is no legislative history construing this clause save for its appearance in the fourth charter draft. No other reference to section 5-403(k) and its subsequent amendments can be found in the commission's minutes.[6]

With regard to section 5-403(k), the majority states that since the charter centralizes administration of financial matters in the finance department, "policies" must be limited to those services the director of finance is directly responsible for. Thus, "policies" cannot be read to include more than leasing and renting procedures adopted by the council. This is not an impermissible interpretation. But as indicated above, the inconclusiveness of the legislative history of section 5-403(k) does not, by the same token, render the council's position untenable. Be that as it may, the legislative history of section 6-603(a) indicates that section 5-403(k) is largely irrelevant to the issue at hand. Section 6-603(a) indicates that the policy-making power of the council with regard to the use of park sites is not limited by the provision of 5-403(k).

The majority maintains that the omission of any reference to the policy-making power of the pre-charter parks board in 5-403(k) does not mean that it has been denied to the department of parks and recreation under 6-603(a).

---

[6] There is a gap in the minutes for meetings which took place between August 19, 1957 and December 1957. During this time the charter's third draft was apparently being circulated. At the gap in the file is the note: "Minutes of Charter Commission meetings missing after August 19, 1957—December 1957." (No minutes taken according to Chairman's File).

The minutes were again taken beginning in January, 1958, with discussion of the charter's fourth draft. No mention is made of the provision which is now section 5-403(k), however.

24

That is true so far as it goes, but the legislative history of section 6-603(a) itself does indeed indicate that the policy-making power of the pre-charter board is not vested in the director of parks. The primary difference between the majority and myself rests on the interpretation to be given section 6-603(a). I turn to the arguments of the majority which pertain to that section.

## IV

My disagreement with the majority is twofold.

First, the majority assumes what in fact is in controversy and renders the final decision a foregone conclusion. With regard to section 6-603(a) it states that the "executive power involved here is the power to decide whether to permit or not to permit a concession on park property." The statement is based on its conclusion that "the power to decide whether to permit or not to permit a concession on any specific city property is not legislative but executive *in nature*" (emphasis added). It goes on to conclude that the power to plan and operate in section 6-603(a) implies the power to decide whether a concession should be permitted.

It cannot be gainsaid that characterization is a powerful instrument by which courts reach decision. The majority cannot take shelter in the characterization it imposes on the power involved here, however. First, it should be noted that no precedent, principle, learned authority, or legislative history, whether intrinsic or extrinsic to the charter is cited in support of the proposition that the power to decide the use of park property is "executive in nature." Second, the issue of what is "executive in nature" was not raised by the parties or the facts of this case, for the simple reason that the parties viewed the power exercised here as a policy-making power. And well might they in light of the language of the pre-charter statute

which stated that the power was to grant concessions which "may be deemed . . . to be in the interest of the city and county." Third, whether the power here is "executive in nature" is not a fact susceptible by reference to any charter provision, to any legislative history surrounding the charter, or to any document. In any case, the majority cites none. At best the decision relies on some hidden principle; at the worst, it precludes the council from presenting to this court contrary evidence as to what is "executive in nature".

A second reading may be accorded "executive in nature". Characterization may stem from the proposition that the function of planning and operating parks is vested in a department of the executive branch and since the power to decide whether a park site should be used for concession purposes is derivative of the power to plan and operate, then, it must be executive also. If that be the proper reading of the majority opinion, it leads to my second ground of disagreement with the majority.

It is axiomatic that the meaning of ambiguous statutory provisions is to be gathered from the legislative history surrounding the statute's enactment. Yet the majority ignores this salutary rule of judicial review. It purports to construe section 6-603(a). But the majority does not in any way acknowledge the legislative history surrounding section 6-603(a). The majority does not refute the express declarations of the commission. Indeed it cannot. There is nothing in the records to indicate that the commission in any way altered its position. No reason is given for distinguishing the treatment of this case from that of any other. If any exists, I cannot see it.

## V

Against this background, the holding of the majority cannot be supported.

"Plan" and "operate" in 6-603(a) are not to be given the broad meaning advocated by the mayor. The commission viewed planning in 6-603(a) as a *function* of administration. Planning in this sense is limited to discretion similar to that exercised by the superintendent of the former parks board. He was charged with "carrying out the policies of the Board." The role of administrative planning in the mayor-council form of government is limited to the formulation, proposal and carrying out of policy, not the establishment of policy.[7]

The organization of the former parks board combined the functions of policy-making and administration. Consonant with the general form of government adopted by the commission the *whole* of the policy-making power of the parks board was vested in the Council, while the administrative function of the parks superintendent was continued under the director of parks. Section 6-603(a) was written to give this proposition effect.

When the majority places the final policy determination concerning the use of park properties in the director of parks it has effectively accomplished what the commission set out to avoid. The drafters of the charter expressly declared their intention to separate policy determination and policy execution in municipal government. By vesting both policy determination and policy execution in the director of parks, the majority disregards the distribution of powers and functions made by the charter, and reverts to a form of government previously rejected by the voters of the municipality.

I would reverse.

---

[7] Memorandum to members from J. B. Atherton, Chairman (February 24, 1958): ". . . [U]nder our proposed Charter, basic planning decisions are considered to be a policy matter, subject to Council action. Furthermore, the general level, and hence cost of services are determined by Council action on the annual budget. Secondly, *administration* of governmental actions and services, including *formulation* of plans and *preparation* of the budget are, with few exceptions, to be the responsibility of a strong mayor."