Loye E. MARTINDALE, Darwin W. Larson, Carol W. Clay, Logan City, a municipal corporation and the Municipal Council of Logan City, Plaintiffs and Respondents,

v.

Mayor Desmond L. ANDERSON, City Attorney J. Blaine Zollinger, City Auditor and Budget Officer Duane A. Beck, Defendants and Appellants.

No. 15498.

Supreme Court of Utah.

July 13, 1978.

J. Blaine Zollinger, Logan City Atty., Logan, Calvin L. Rampton and Suzanne Dallimore of Jones, Waldo, Holbrook & McDonough, Salt Lake City, for defendants and appellants.

N. George Daines, III of Daines & Daines, Logan, for plaintiffs and respondents.

HALL, Justice:

Defendant, Desmond L. Anderson, Mayor of Logan City, appeals from a judgment of the District Court construing the Optional Forms of Government Act [1] of 1975 (hereinafter referred to as the "Act"). The trial judge declared that, under the council-mayor form of government provided for by the Act, the Council possessed *all* of the governing powers of the municipality (both legislative and executive), except for those executive powers the Act expressly vested in the Mayor.

1. U.C.A., 1953, 10–6–103 et seq., since repealed by Laws of 1977 which repealed all of former Chapter 6 and enacted new provisions covering the same subject matter. The Act, as now recodified, appears in U.C.A., 1953, 10–3–1201 et seq.

The Mayor contends that the Court erred in its interpretation of the Act and that, when properly interpreted, it provides for a complete separation of executive and legislative powers, the former being lodged exclusively in the Mayor, and the latter in the Council. He further contends that this is so because the Act is patterned after the absolute separation of powers doctrine set forth in the federal and state constitutions. With these contentions we agree and reverse the ruling of the trial court.

The electorate of Logan City adopted the council-mayor form of government pursuant to the authority conferred by the Act and it became effective in January, 1976. Disputes promptly arose as to the extent of the Mayor's power to: (1) manage City property, including the purchase and sale thereof; (2) approve subdivision plans; and (3) transfer funds within a departmental budget. A further dispute arose as to the Mayor's obligation to assemble data on demand of individual council members. These disputes precipitated this declaratory judgment action brought by a majority of the five-member Logan City Municipal Council against the Mayor. The two remaining councilmen appear as amici curiae in support of the Mayor's position; and three state legislators also appear as amici curiae for the avowed purpose of informing the Court as to the legislative intent in enacting the Act.

In order to place the issues presented by this appeal in proper perspective it is helpful to trace the structural development of municipal government in Utah.

The Constitution of Utah provides for the creation of municipalities by legislative enactment[2] and any incorporated city may frame and adopt a charter for its own government.[3] All of the governing powers of the municipalities are derived from the Legislature[4] which traditionally has vested those powers (both executive and legislative) in a *single* governing body[5] consisting of either a board of commissioners, mayor and council, or a board of trustees, depending upon the classification of the municipality based on population.[6] These traditional forms of municipal government have been described as "government by committee" since a single governing body exercises all governing powers. Mayors and town presidents are merely the presiding officers of the governing body and simply carry out its executive decrees. They have no significant powers of their own and are, in reality, only titular heads of municipal government.

The foregoing forms of municipal government have persisted since territorial days and it was not until 1959 that the Legislature provided for a substantial departure therefrom. It did so by an act entitled "Strong Mayor Form of Government"[7] which enabled cities of the first and second class to adopt, at their option, a strong mayor form of government. That legislation was significantly innovative since it not only vested municipal government in a mayor and a board of five commissioners,[8] it also expressly separated the executive and legislative powers by vesting the former in the mayor, as chief executive officer and by vesting the latter in the board of commissioners.[9] It was from that legislation that the initial legislative intent clearly emerged to provide an optional form of municipal government framed in the image of the federal and state systems.

2. Const. of Utah, Art. XI, Sec. 5.

3. Tooele City adopted such a home rule charter in 1965.

4. *Salt Lake City v. Sutter*, 61 Utah 533, 216 P. 234 (1923).

5. U.C.A., 1953, 10–6–5, since repealed by Laws of 1977; new provisions covering same subject matter are now found in U.C.A., 1953, 10–3–101 et seq.

6. Supra, footnote 2; U.C.A., 1953, 10–1–1.

7. U.C.A., 1953, 10–6–76 et seq., since repealed, supra, footnote 1.

8. U.C.A., 1953, 10–6–78, since repealed, supra, footnote 1.

9. U.C.A., 1953, 10–6–79, since repealed, supra, footnote 1.

In 1975 the Legislature repealed the Strong Mayor Form of Government Act [10] and enacted substantially similar provisions in the Act upon which this appeal focuses. The legislative intent remained clear to provide variations in the traditional forms of government consistent with present day needs as is evidenced by the following observation inserted as a preface to the Act:

The legislature of the State of Utah, finding that increasing demands for services and growing citizen awareness and concern have strained the ability of Utah's local governments to respond effectively, determines that there is a need to provide optional forms of municipal government under which citizens may vote to organize to meet their needs and desires.[11]

The Act provided for optional forms of government known as council-mayor and council-manager forms and made them available to *all* municipalities, regardless of their classification.[12]

As in the prior legislation which provided for the strong mayor form of government,[13] the government of the municipality adopting the council-mayor form was vested in the mayor *and* the municipal council.[14] This is to be distinguished from the traditional forms of municipal government which vest the governing powers in a single governing body.[15]

The Act designated the municipal council as the *governing body* [16] and also specifically defined it as the *legislative body*.[17] It thereafter expressly defined its powers and duties as being to pass ordinances, appropriate funds, review municipal administration, and to perform all duties that may be required by law.[18] It further expressly placed limitations upon the authority of the council members as follows:

No member of the council shall seek individually to influence the acts of the chief executive or any other officer . . to interfere in any way with the performance by such officers of their duties. *The council and its members shall deal with the administrative affairs of the municipality solely through the chief executive . . . .*[19] [Emphasis added.]

The Act excluded the Mayor from a. seat on the Council and provided for the selection of a Chairman by a majority vote of council members.[20] The only legislative power reserved to the Mayor was that of veto which could be overridden by a two-thirds vote of the Council.[21]

In regard to the matter of executive powers, the Act designated the Mayor as the chief executive and administrative officer and expressly defined his powers and duties as follows:

In the optional form of government known as the council-mayor form, the mayor shall be the chief executive and administrative officer of the municipality. He shall have the power and duty to:

(1) Enforce the laws and ordinances of the municipality.

10. Supra, footnote 7.

11. U.C.A., 1953, 10–6–105, since repealed, supra, footnote 1; re-enacted verbatim in U.C.A., 1953, 10–3–1202.

12. U.C.A., 1953, 10–6–106, since repealed, supra, footnote 1, but same provision re-enacted in U.C.A., 1953, 10–3–1203.

13. Supra, footnote 7.

14. U.C.A., 1953, 10–6–112, since repealed, supra, footnote 1. Similar, but more explicit provision now appears in U.C.A., 1953, 10–3–1209.

15. Supra, footnote 5.

16. U.C.A., 1953, 10–6–113, since repealed, supra, footnote 1.

17. U.C.A., 1953, 10–6–104(2), since repealed, supra, footnote 1.

18. U.C.A., 1953, 10–6–113, since repealed, supra, footnote 1, but same powers and duties were re-enacted in U.C.A., 1953, 10–3–1210.

19. U.C.A., 1953, 10–6–121, since repealed, supra, footnote 1, re-enacted nearly verbatim in U.C.A., 1953, 10–3–1217.

20. U.C.A., 1953, 10–6–116, since repealed, supra, footnote 1, similar provisions now found in U.C.A., 1953, 10–3–1213.

21. U.C.A., 1953, 10–6–117, since repealed, supra, footnote 1 re-enacted verbatim in U.C.A., 1953, 10–3–1214.

(2) Execute the policies adopted by the council.

(3) Appoint and remove administrative assistants, including a chief administrative officer, as he shall deem necessary; with the advice and consent of the council appoint department heads; remove department heads; and appoint and remove all other officers, commissions, boards, and committees of the municipality, except as may otherwise be specifically limited by law.

(4) Exercise control of all departments, divisions, and bureaus within the municipal government.

(5) Attend all meetings of the council with the right to take part in all discussions and the responsibility to inform the council of the condition and needs of the municipality and make recommendations and freely give advice to the council, except that the mayor shall not have the right to vote in council meetings.

(6) Appoint a budget officer for the purpose of conforming with the requirements of the Uniform Municipal Fiscal Procedures Act (chapter 10 of Title 10) [section 10–10–23 et seq.]; and in all other respects fulfill the requirements of that act.

(7) With the advice and consent of the council appoint a qualified person to each of the offices in cities of recorder, treasurer, engineer, and attorney and, in towns, town treasurer and town clerk; create such other offices as may be deemed necessary for the good government of the municipality, and make appointments to them; and regulate and prescribe the powers and duties of all other officers of the municipality; except as provided by law or by ordinance.

(8) Furnish the municipal council with a report, periodically as determined by ordinance, setting forth the amounts of all budget appropriations, the total disbursements to date from these appropria-tions, and the amount of indebtedness incurred or contracted against each appropriation (including disbursements and indebtedness incurred and not paid) and the percentage of the appropriations encumbered to date, which reports shall be made available for public inspection.

(9) Perform such other duties as may be prescribed by this act or may be required by ordinance not inconsistent with this act.[22]

The Legislature saw fit to repeal and recodify the Act in 1977, however it remains basically unchanged in its present form.[23] In an apparent effort to clarify its intent to continue the strong mayor concept of complete separation of executive and legislative powers, the Legislature deleted from the Act the provision designating the Council as the governing body and adopted the following:

Each municipality shall have a governing body which shall exercise the legislative and executive powers of the municipality unless the municipality is organized with separate executive and legislative branches of government.[24]

By way of further clarification, the recodification expressly provided for the separation of the executive and legislative branches of government as follows:

The optional form of government known as the council-mayor form vests the government of a municipality which adopts this form in two separate, independent, and equal branches of municipal government; the executive branch consisting of a mayor and the administrative departments and officers; and the legislative branch consisting of a municipal council. . . .[25]

The above-described modifications of the Act have no direct application in resolving the issues presented by this appeal because their enactment was subsequent to the adoption of the council-mayor form of

22. U.C.A., 1953, 10–6–123, since repealed, supra, footnote 1; re-enacted verbatim in U.C.A., 1953, 10–3–1219.

23. Supra, footnote 1.

24. U.C.A., 1953, 10–3–101.

25. U.C.A., 1953, 10–3–1209.

government by Logan City. However, since this is a declaratory judgment proceeding, the prospective effect thereof is to be considered.

The trial judge, in reaching his decision, specifically observed: (1) that the Act declared the Council to be the governing body; (2) that the 1977 modifications thereof eliminated that designation but otherwise left the respective powers and duties of the Mayor and Council basically unchanged; and (3) that he should not indulge in "the semantics involved in the definition of governing power or powers." He concluded from those observations that the Act vested legislative powers exclusively in the Council and, apparently because the Council was the "governing body," he further concluded that it was entitled to exercise those executive powers not expressly reserved to the Mayor.

We agree with the conclusion that the Council is vested with all legislative powers, and find full support for it in those provisions of the Act which specifically deprive the Mayor of Council membership or a vote thereon. On the other hand, we cannot agree with the conclusion that the executive powers of the municipality are to be in some way shared. Such a conclusion devises an anomalous form of government not heretofore known and not intended by the Act.

We are of the opinion that the trial judge placed undue emphasis on that portion of the Act which declared the Council to be the "governing body." His disinclination to construe all of the provisions of the Act in the light of the definition of that term, as set forth in the Act, caused him to draw erroneous conclusions and thus misinterpret the law.

When the Act is read in its entirety, and each provision thereof is read in context with all of the others, and when viewed in the light of the legislative history of municipal government in Utah, we are compelled to conclude that it in fact provides for the absolute separation of executive and legislative powers. A fortiori, the 1977 modifications to the Act specifically vest the whole of the executive powers in the Mayor and only the legislative powers in the Council, and we consequently hold that the council-mayor form of government as adopted by Logan City is a true separation of powers form of government.

In order to resolve those issues which bear upon the management of city property, approval of subdivisions and budgetary transfers, it now only becomes necessary to determine whether the Mayor usurped any of the legislative powers of the Council in performing those functions. Helpful to such a determination is a definition of executive and legislative powers. Simply stated, legislative powers are policy *making* powers, while executive powers are policy *execution* powers. Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty to make such enforcement. The latter are executive functions.[26] They are the acts necessary to carry out legislative policies and purposes and are deemed acts of administration.[27]

The Act, by direct implication, confers policy-making functions upon the Council since it expressly empowers the Mayor to execute the policies adopted by the Council.[28] The policy-making powers reserved to the Council clearly do not encompass decisions to buy or sell property or to otherwise manage it. On the contrary, those policy-making powers only pertain to its authority to prescribe by ordinance the general rules to be followed by the executive branch in exercising its powers of property management. We consequently hold that the management of city property, including its sale and purchase, is an executive function reserved to the Mayor.

---

**26.** *Rampton v. Barlow*, 23 Utah 2d 383, 464 P.2d 378 (1970).

**27.** *Monahan v. Funk*, 137 Or. 580, 3 P.2d 778 (1931).

**28.** U.C.A., 1953, 10–6–123(2), since repealed, supra, footnote 1, identical provision now appears in U.C.A., 1953, 10–3–1219(2).

When viewed in the light of the foregoing concepts, the approval of subdivisions in accordance with rules, policies, and procedures adopted by the legislative branch of municipal government clearly appears to be a function of the executive branch. In apparent recognition thereof, the Logan City Council adopted ordinances [29] setting forth the procedures to be followed in reviewing and approving application for planned unit, interblock, and cluster developments. Briefly stated, the ordinances specify the information to be contained in the applications, provide for notice to all interested persons by mail and publication, and list general criteria and conditions for approval; furthermore, they provide for review and approval by the City Planner, submission thereafter to the Planning Commission for review, public hearing, and approval, and ultimately, for approval by the Mayor.

In treating this issue, the trial judge, although erroneously, had already determined that the Council was generally vested with executive powers as would permit it to approve subdivisions. Consequently, he unnecessarily concerned himself with the, delegability of that power.

▬▬ Consistent with the doctrine of separation of powers, the Council has no executive powers to delegate and it only exercised its legislative powers in adopting the ordinances which established the policies to be executed by the Mayor in reviewing and approving subdivisions. In reaching this conclusion we are not unmindful of three separate statutory provisions, separate from the Act, which bear upon the approval and subsequent recordation of subdivision plats in the office of the county recorder. One such provision provides for approval by the planning commission and "legislative body" and renders void any subdivision plat recorded in the office of the county recorder which has not been so approved; [30] another provides for approval by the "legislative authority"; [31] and the third provides for approval "by its governing body, or by some city or town officer for that purpose designated by resolution or ordinance." [32]

The inconsistencies in the terminology of the statutes in referring to the approving authority is of some concern, but is by no means overpowering for the following reasons. The obvious purpose of each of the statutes is to insure appropriate approval of plats in order to preserve their sanctity when recorded. This is necessary to protect those who acquire property within the plats, since a properly recorded plat is a prerequisite to valid title. It is also obvious that the statutes do not undertake to *vest* any authority to approve plats but only to recognize *existing* authority to approve and require it to act. Hence their use of the terms "legislative body," "legislative authority," and "governing body" must be deemed to have been in their generic sense only and not an attempt to designate the functions of any particular governing body.

It is also to be observed that the statutes are of long duration, having been enacted before strong-mayor and council-mayor forms of government were provided for, and when only traditional forms of government were available. Consequently, it is not surprising that they contemplate only a single governing body exercising both legislative and executive powers. It is interesting to note, however, that even so, the statute that appears in the "Plats and Subdivisions" chapter of the Code [33] recognizes that the governing body may designate, by resolution or ordinance, a city or town officer as the approving authority.

▬▬ We conclude that the Mayor's approval of subdivision plats is an appropriate exercise of executive power and that such is in compliance with statutory requirements and prerequisites for the recording thereof.

29. Sec. 17–3–1 and 2, Logan City Ordinances.

30. U.C.A., 1953, 10–9–25.

31. U.C.A., 1953, 17–21–8.

32. U.C.A., 1953, 57–5–3.

33. Ibid.

The issue raised by the Mayor concerning transfers of funds within a departmental budget requires the interpretation of the following statute:

> With the consent of the budget officer, the head of any department may transfer any *unencumbered or unexpended appropriation balance* or any portion thereof from one expenditure account to another within the department during the budget year, *or an excess expenditure of one or more line items* may be permitted by any department head with the consent of the budget officer, provided the total of all excess expenditures or encumbrances do not exceed total unused appropriations within the department at the close of the budget year. [Emphasis added.][34]

The trial judge interpreted the statute as permitting department heads, with the consent of the budget officer, to transfer unencumbered or unexpended appropriations within a department without Council approval. He further interpreted "encumbered" appropriations to be funds set aside in the budgetary process for the purchase of specifically described line items such as motor vehicles and motor patrols. The effect of his interpretation was to prevent transfers of such "encumbered" funds without Council approval.

The Mayor contends that the term "line item" should be construed as the composite total of the departmental appropriations rather than the individual listings set forth therein and urges that interpretation on this Court so as to give administrative departments wide latitude in adjusting funds so as to meet the exigencies of government. On the other hand, the Council contends such an interpretation would destroy the integrity of the participatory budget process set forth in the Uniform Municipal Fiscal Procedures Act[35] applicable to council-mayor forms of government.[36]

We are persuaded that the trial judge's interpretation is correct and in conformity with the over-all concept of the said Uniform Municipal Fiscal Procedures Act which defines "appropriation" as an allocation of money to be expended for specific purposes.[37] The Act defines its "encumbrance system" as the method of budgetary control whereby part of an appropriation is reserved to cover a *specific* expenditure.[38] His interpretation preserves the necessary balance between the government's need for flexibility in budgetary matters and the general public's right to be apprised of any intention to vary prior appropriations, and we do not disturb it.

In regard to the issue as to what administrative information is to be made available to the Council, the trial court aptly noted that the Council is entitled to all administrative records of the city and that they may adopt a reasonable policy by resolution or ordinance by which they may obtain that information. This ruling is most appropriate and we also do not disturb it.

The final point to be considered herein is the propriety of the expenditure of city funds for legal services rendered to the Council to set aside prior sales of real property by the Mayor. The trial court ruled that such expenditures were a proper city expense, but the parties here concede that the correctness of that ruling was dependent upon the corresponding correctness of its ruling as to the Mayor's power to manage city property. Having found as we have that the Mayor in fact has that power, it follows that the award of attorney's fees must be reversed and we so hold.

ELLETT, C. J., and MAUGHAN and WILKINS, JJ., concur.

CROCKETT, Justice (concurring and dissenting in part):

I concur with that part of the main opinion which affirms the decision of the trial court as to: (1) the Mayor's lack of authori-

---

**34.** U.C.A., 1953, 10–10–46.

**35.** U.C.A., 1953, 10–10–23 et seq.

**36.** U.C.A., 1953, 10–3–1204.

**37.** U.C.A., 1953, 10–10–27(17).

**38.** U.C.A., 1953, 10–10–27(18).

ty to transfer encumbered funds within a departmental budget, and (2) the Council's right of access to administrative information. However, I dissent from that portion of the opinion which reverses the trial court and holds that, under the council-mayor form of city government, the Mayor has unrestricted power to buy or sell city property and to approve subdivisions.

The main opinion correctly points out that cities are creatures of the legislature and that they have only those powers expressly granted, or those necessarily implied in order to discharge the responsibilities imposed upon them by law.[1] It follows, a fortiori, that that rule also applies to officers of the city, including the Mayor.[2] In regard to the powers claimed by the Mayor, as compared to the Council, it is appropriate to keep in mind the just-stated principle and to examine the statutes in harmony with their background and purpose, as the main opinion suggests. But doing so leads me to the opposite conclusion.

The main opinion indicates that early forms of municipal government in Utah did not employ a system of separated and balanced powers, often vesting all governing authority in a single body and designating a mayor as a mere presiding officer or titular head of that body; and suggests that the 1959 Act was intended to permit the adoption of a "Strong Mayor" type of government.[3] It is my impression that the controversy which has arisen in this case is due, in large part, to an unwarranted assumption that the council-mayor form of city government adopted by Logan City is in some way related to and takes character from that title of the 1959 Act.[4] The fallacy in the Mayor's position is that the 1975

Act,[5] which repeals the former Act, bears no such title; and that there is no expression whatsoever to be found in the language of the 1975 Act to support the so-called "Strong Mayor" form of city government.

The Mayor's difficulty is in failing to recognize and give effect to the plainly stated intent of the Act. The statute which gives cities the option of adopting the council-mayor form of government is Sec. 10–3–1209, U.C.A.1953, which provides for:

. . . *two separate, independent, and equal branches of municipal government*; the executive branch consisting of a mayor and the administrative departments and officers; and the legislative branch consisting of a municipal council.

The just-quoted language should be understood in the light of the historical development of democratic government in this country. One of the fundamental principles inherent in the patterns of American government, as the quoted language plainly indicates, is that there should be a separation of powers between the branches of government so that they can operate as a check and balance upon each other. Another is that because the legislative branch derives its powers directly from and is responsible to the people, the residuum of any undelegated power is reposed therein;[6] and the Mayor cannot hypothesize nor arrogate powers to himself by a contrary assumption. The fair and proper assumption is that the Legislature had the foregoing in mind in creating the council-mayor form and that the voters of Logan so understood.

Consistent with the foregoing, the trial court correctly held that the defendant Mayor's powers "are restricted to those spe-

---

1. 56 Am.Jur.2d, Municipal Corporations, section 151; *Johnson v. Sandy City Corp.*, 28 Utah 2d 22, 497 P.2d 644 (1972); *Ritholz v. City of Salt Lake*, 3 Utah 2d 385, 284 P.2d 704 (1955).

2. "As is the case of municipal officers generally, the functions and powers of the mayor of a city are derived from, and depend entirely on, constitutional, statutory, or charter provisions and valid ordinances, resolutions, or bylaws, passed in accordance therewith; and he takes nothing beyond the powers expressly conferred

or necessarily implied." 62 C.J.S. Municipal Corporations § 543.

3. U.C.A.1953, 10–6–76, et seq.

4. Id.

5. U.C.A.1953, 10–3–1201, et seq.

6. See *Wood v. Budge*, 13 Utah 2d 359, 374 P.2d 516; *Trade Comm. v. Skaggs Drug Centers, Inc.*, 21 Utah 2d 431, 446 P.2d 958.

cifically enumerated in the legislation" i. e., Sec. 10–3–1219 as quoted in the main opinion. From a careful scrutiny of that section it will be seen that the only subsections thereof which could even arguably be considered as conferring upon the Mayor the powers he claims of being able to sell city property and approve subdivisions are subsections (2) and (9) which state that he shall have the power and duty to:

(2) Execute the policies *adopted by the council,*

and

(9) Perform such other duties as may be prescribed by this act *or may be required by ordinance* not inconsistent with this act. [All emphasis herein added.]

It is submitted that neither of those sections can by any stretch of language or logic be construed to constitute a grant to the Mayor of any such authority. On the contrary, each plainly indicates that what it authorizes him to do is subject to approval by the Council. In subsection (2), the policies he is to execute are limited to those "adopted by the council." In subsection (9), the duties he is to perform are those "prescribed by this act or required by ordinance . . ." i. e., by action of the Council. It is also to be had in mind that there is a basic rule of statutory construction that when powers are claimed under a statute, such as the Mayor claims here, those powers not expressly stated are deemed to be excluded.[7]

In complete harmony with the decision of the trial court and the intent of the Act, as discussed in this dissent, are the statements in the main opinion concerning the approval of subdivisions by the "legislative body,"[8] by the "legislative authority"[9] and by the "governing body, or by some city or town officer . . . designated by resolution or ordinance."[10] Each of those can refer to nothing other than the Council. (No contention is made that the Council has so designated the Mayor.)

Considerations of basic governmental policy and practical operation of the city also harmonize with what is said above concerning the express language and intent of the statute. The far-reaching power to sell any substantial city property (and this apparently would be without limit) is something which it should require cooperative consideration of and action by both the Council, and the Mayor. It is my judgment that each of those offices should be accorded only those prerogatives expressly granted or those necessarily implied in order to perform the duties with which they are charged.[11] Such an interpretation and application of the Act would insure against any wilfull arrogation of powers by either branch;[12] and thus maintain the check upon each other essential to the safeguarding of the best interests of the city and the welfare of its inhabitants.

It is my opinion that the trial court was ineluctably correct in his determination that there cannot be found in the statute, either expressly or by fair implication, any authority in the Mayor to sell city property or to issue final approval of city subdivisions without approval of or authorization by the Council.

For the above reasons, I would affirm the decision of the trial court.

7. See 56 Am.Jur.2d, Municipal Corporations, section 195; 62 C.J.S. Municipal Corporations § 120.

8. U.C.A.1953, 10–9–25.

9. U.C.A.1953, 17–21–8.

10. U.C.A.1953, 57–5–3.

11. That, as a general rule, the powers of a municipal corporation are to be strictly construed, and any ambiguity or reasonable doubt is to be resolved against finding that a grant was made, see 62 C.J.S. Municipal Corporations § 119. I would apply the same rule when any city officer asserts the power to act as the Mayor has here.

12. See *City Council of Honolulu v. Fasi*, Hawaii, 467 P.2d 576 (1970).