2004 UT 24

**COUNCIL OF HOLLADAY CITY,**
**Plaintiff and Appellee,**

v.

**Mayor Dennis LARKIN, Defendant**
**and Appellant.**

**Holladay Preservation League,**
**Intervenor and Appellant.**

**No. 20030592.**

Supreme Court of Utah.

March 26, 2004.

---

Victoria W. Romney, William R. Hyde, Salt Lake City, for Mayor Dennis Larkin.

H. Craig Hall, Jody K. Burnett, Ryan D. Bjerke, for Holladay City Council.

Joseph E. Tesch, Kraig J. Powell, Park City, for intervenor Holladay Preservation League.

Martin K. Banks, Mark E. Hindley, Salt Lake City, for intervenor Holladay Citizens for Progress.

NEHRING, Justice:

¶ 1 Holladay City Mayor Dennis Larkin and the Holladay Preservation League appeal a decision by the district court ruling that the Holladay City Council lawfully adopted a resolution to change the form of Holladay City's government. We affirm.

## BACKGROUND

¶ 2 Holladay City became a fourth class municipality in 1999. At its inception, its citizens adopted a council-mayor form of government. By 2003, discord over municipal policy divided the City Council and Mayor Larkin.

¶ 3 In June 2003, the City Council enacted Resolution No. 03–34. This resolution called for a special election in which the electorate would be given the opportunity to vote on a proposal to replace the council-mayor form of government with the council-manager form. Mayor Larkin opposed the abandonment of the council-mayor form—an understandable position since his office would disappear in the council-manager form. Mayor Larkin argued (1) that Utah law required that the resolution be adopted by the governing body of the City, and (2) that the mayor was part of the governing body and therefore the City Council could not lawfully adopt the resolution without affording him the opportunity to either vote or exercise veto power over it. He further claimed that the City Council had no authority to call for the special election contemplated in the resolution.

¶ 4 In the face of this controversy, the City Council filed a lawsuit seeking declaratory relief. Mayor Larkin moved to dismiss the lawsuit and counterclaimed, alleging that the statutes governing the change in the form of municipal government and the procedures for providing notice of an election to change the form of government were unconstitutional.[1]

¶ 5 The district court rejected Mayor Larkin's claims, found the actions of the City Council lawful, and ordered the election mandated by the resolution to proceed. The mayor appealed. On September 11, 2003, we issued an order affirming the decision of the district court, stating that an opinion would follow.

## ANALYSIS

¶ 6 Mayor Larkin's appeal presents us with issues of statutory and constitutional interpretation which we review for correctness. *State v. Schofield,* 2002 UT 132, ¶ 6, 63 P.3d 667. We hold that resolution 03–34 was properly enacted by the Holladay City Council, free from formal mayoral participation by either vote or veto. This outcome is mandated by the application of statutes relating to municipal governance and by the wisdom imparted by the constitutions of the United States and of our state—that the power to alter our fundamental institutions of government rests in the legislature and the people, and not in the executive branch. We also hold that the statutes providing notice to the electorate were not an unconstitutional violation of the people's fundamental right to vote.

## I. ENACTMENT OF RESOLUTION 03–34

¶ 7 The Optional Forms of Municipal Government Act authorizes a municipality to propose a reorganization of municipal government through the enactment of a resolution passed by the "governing body of the municipality." Utah Code Ann. § 10–3–1203(3)(a) (2003).[2] Both Mayor Larkin and

---

1. The district court granted intervention to two citizens' groups, Holladay Preservation League and Holladay Citizens for Progress.

2. The statutory authority to reorganize municipal government is found in the Optional Forms of Municipal Government Act, which states:

(1) A municipality may reorganize under any form of municipal government provided for in

the City Council recruit numerous statutory provisions in aid of their respective claims regarding the proper definition and composition of Holladay City's governing body. Although each of their respective efforts at statutory interpretation yields plausible results, we conclude that our statutes fall well short of providing clear guidance to municipalities that seek to reconstitute themselves.

¶ 8 This is not our first encounter with a perplexing inconsistency in our laws regulating municipal governance. In *Martindale v. Anderson*, we confronted the task of identifying the composition of the "governing body" of a municipality that had selected a strong mayor form of government. 581 P.2d 1022 (Utah 1978). There, we expressed the view that "[t]he inconsistencies in the terminology of the statutes in referring to the approving authority [for the sale of municipal property and approval of subdivisions] is [sic] of some concern." *Id.* at 1028. We observed that those inconsistencies had led the district court to "place[ ] undue emphasis" on statutory language that defined the city council as the "governing body." *Id.* at 1027. Concluding that the district court's interpretation was too narrow, we looked beyond the language of the statute to the legislative history of municipal government in Utah and determined that under the facts of *Martindale*, "governing body" should be defined generically, free of any linkage to the functions of any particular governing body. *Id.* at 1028.

■ ¶ 9 The statutory language relating to the meaning of "governing body" which caused us concern in 1978 confronts us again. As in *Martindale*, we reject an analysis which turns on a strictly text-based definition of "governing body." We do so despite the fact that section 10–3–101 attempts to define "governing body" by stating that "[e]ach municipality shall have a governing body which shall exercise the legislative and executive powers of the municipality unless the municipality is organized with separate executive and legislative branches of municipal government." Utah Code Ann. § 10–3–101 (2003). This attempted definition provides no guidance as to the composition of the governing body of Holladay City, a municipality that adopted the council-mayor form and thus had separate executive and legislative branches.

¶ 10 Because our quest to discover the legislature's intent regarding the allocation of power when adopting a resolution to change the form of government is obstructed by this unclear statutory framework, we shift our focus from the statutory text to an examination of the evolution of our law relating to the organization of municipal government. *State v. Ostler*, 2001 UT 68, ¶ 9, 31 P.3d 528.

¶ 11 Before 1959, the legislative and executive branches of a city were unified in one entity designated as either a commission or a council, depending on the classification of the city.[3] Utah Code Ann. §§ 10–6–1 to –3 (1953) (amended 1959). Under either statu-

this part or under Section 10–3–103, 10–3–104, 10–3–105, or 10–3–106, regardless of the city's class under Section 10–2–301.

(2) Reorganization under Subsection (1) shall be by approval of a majority of registered voters of the municipality voting in a special election held for that purpose.

(3)(a) The proposal may be entered on the ballot by resolution passed by the governing body of the municipality or by initiative as provided for in Title 20A, Chapter 7, Part 5, Local Initiatives—Procedures.

(b) The resolution or petition shall state the number, method of election, and initial terms of council members and shall specify the boundaries of districts substantially equal in population if some or all council members are to be chosen from these districts.

(4)(a) The proposal shall be voted upon at a special election to be held not more than twelve months after the resolution is passed or after receipt of a valid initiative petition.

(b) The special election shall be held at least 90 days before or after regular municipal elections.

(c) The ballot for the special election to adopt or reject one of the forms of municipal government shall be in substantially the following form:

Shall (name of municipality), Utah,     Yes
adopt the (council-mayor)
(council-manager) (five-member
commission) (three-member commission)
(six-member council) (five-member
council) form of municipal government?    No

Utah Code Ann. § 10–3–1203 (2003).

3. Towns were governed by a board of trustees consisting of a president and four trustees, elected at large. Utah Code Ann. § 10–6–4 (1953).

tory designation, municipal officers were "the legislative and governing bodies of such cities and towns." *Id.* § 10–6–5. The mayor was allowed to vote on all issues but expressly had no veto power. *Id.* § 10–6–13. No municipality was permitted to have a form of government with separate executive and legislative branches.[4] *Id.* §§ 10–6–1 to –3. Under the then-existing framework, the term "governing body" served as a useful collective reference to the two types of unified municipal governmental forms—commission and council—but had no substantive significance, so there was no reason to define the term.

¶ 12 In 1959, the legislature enacted the Strong Mayor Form of Government Act, which granted first and second class cities the option of adopting a form of municipal government with separate, independent legislative and executive branches modeled on the separation of powers structure of state and federal government. 1959 Utah Laws ch. 20, § 4;[5] *Biddle v. Wash. Terrace City,* 1999 UT 110, ¶ 11, 993 P.2d 875. Although the Strong Mayor Act introduced separation of powers to Utah's municipalities, it did not attempt to redefine "governing body" to accommodate this development. "Governing body" thus retained its descriptive and generic meaning after the adoption of the Strong Mayor Act.

¶ 13 The procedure adopted by the Strong Mayor Act to replace the traditional unified form of municipal government with the separation of powers model was similar to that now in place. Of particular significance, both the Strong Mayor Act and the current law provide that reorganization shall be commenced by resolution "passed by the governing body." Utah Code Ann. § 10–6–102 (Supp.1961); *id.* § 10–3–1203(3)(a) (2003). The legislature's choice of the term "governing body" in this context was logical and readily understandable. Prior to the enactment of the Strong Mayor Act, all municipalities were organized with a unified governmental structure which, although designated

by various titles, constituted a "governing body." *See* Utah Code Ann. §§ 10–6–1 to –5 (1953). The Strong Mayor Act assumed that only municipalities with generic, unified governing bodies would choose to change their governmental form. There was, therefore, no reason to modify the reorganization procedure to accommodate the desires of municipalities which had adopted the Strong Mayor form and later wished to abandon that governmental form and return to the unified form.

¶ 14 In 1975, the legislature enacted the Optional Forms of Municipal Government Act to replace the Strong Mayor Act. Utah Code Ann. §§ 10–6–103 to –132 (Supp.1975). This Act, firmly grounded in the principle of separation of powers, enabled cities of any population classification to choose between two additional forms of government: the council-manager and the mayor-council forms. *Id.* §§ 10–6–105, –112; *see also Biddle,* 1999 UT 110 at ¶ 12, 993 P.2d 875.

¶ 15 Here, for the first time, the legislature defined "governing body" by stating that " '[g]overning body' means the legislative body of any city or town organized under this act." Utah Code Ann. § 10–6–104 (Supp. 1975). This provision was supplemented by section 10–6–113, which states: "The municipal council of a municipality adopting an optional form of government provided for in this act shall be the governing body of that municipality and shall pass ordinances, appropriate funds, review municipal administration, and perform all duties that may be required of them by law." Furthermore, the legislature left intact the 1959 Strong Mayor Act's procedure for commencing governmental reorganization by a resolution passed by the governing body—there, the city council. Utah Code Ann. § 10–6–106 (Supp.1975).

¶ 16 In 1977, the legislature repealed and recodified the Optional Forms Act as Utah Code sections 10–3–1201 to –1228. *See* Utah

---

4. Cities were divided into only three classifications: first, second, and third, depending on the number of inhabitants. *Id.* § 10–1–1. All municipalities smaller than a third class city were deemed towns. *Id.* The governments of first, second, and third class cities were each prescribed by sections 10–6–1, –2, and –3, respec-

tively, as comprising a mayor and either a board of commissioners or a city council.

5. Codified as Utah Code Ann. § 10–6–79 (Supp. 1961) (repealed 1975).

Code Ann. §§ 10–1–101, –114 (1977). This Act also amended the definition of "governing body" to that which confounded us in *Martindale* and perplexes us again today. *Id.* § 10–1–104(2). In *Martindale,* we traced the reformulation of the term "governing body" and concluded that it reflected the legislature's "effort to clarify its intent to continue the strong mayor concept of complete separation of executive and legislative powers." 581 P.2d at 1026. By narrowly focusing its attention on the principle of separation of powers, the legislature left outside its field of vision the need to harmonize considerations of "governing body" with governmental reorganization procedures.

¶ 17 The analytical difficulties caused by the absence of statutory guidance on the composition of the "governing body" in the council-mayor form are compounded by ambiguity over how, if at all, Mayor Larkin would participate in the process of "passing" a reorganization resolution. Under the Optional Forms Act, mayors have the authority to "disapprove" any ordinances passed by the council, subject to a two-thirds override vote by that body. Utah Code Ann. § 10–3–1214 (2003). However, the statutory procedure for adopting municipal ordinances in the mayor-council form is an inapt model for "passing" a reorganization resolution because municipal ordinances are an entirely different statutory species than resolutions. *Compare id.* §§ 10–3–701 to –716 (statutes governing ordinances) *with* §§ 10–3–717 to –719 (statutes governing resolutions). None of the general statutory provisions which address the lawful scope of municipal ordinances, resolutions, or the procedure for their enactment provide guidance to a municipality desiring to alter its form of government. Rather, a resolution to hold an election to reorganize municipal government as described in section 10–3–1202 is a unique exercise of governmental authority. Unfortunately, the companion statutory provisions to section 10–3–1202 offer insufficient direction for the proper use of that authority.

■ ¶ 18 Having determined that no meaning of "passed by the governing body" can be gleaned from the text of the Optional Forms Act that will remain true to the pur-pose and intent of the Act, we conclude that it is impossible to reach a rational statutory reconciliation of the governmental reorganization procedures with the council-mayor form of government. In matters of statutory interpretation where the statutes in question are not clear, we turn to the structure of our governmental institutions. *Clover v. Snowbird Ski Resort,* 808 P.2d 1037, 1045 (Utah 1991).

¶ 19 Under the federal and state systems after which the council-mayor form of municipal government is modeled, fundamental changes to the structure of government are accomplished by constitutional amendment. The procedures set out in article V of the Constitution of the United States and in article XXIII of the Utah Constitution vest the power to amend these charters in the legislative branch and in the people. No role is assigned to the executive branch. This allocation of power to alter the most basic expression of our commitment to ordered society is clearly expressed in our state constitution, which declares that "[a]ll political power is inherent in the people ... and they have the right to alter or reform their government as the public welfare may require." Utah Const. art. I, § 2.

¶ 20 Constitutional amendments are legislative in nature and it is, therefore, appropriate that the power of the people to initiate amendments be shared with their elected representatives. No claim to participation in the amendment process can be made by the executive branch in our federal or state system of government. Thus, the fact that the legislature modeled its separation of powers scheme for municipal government on our federal and state systems persuades us that it intended to limit participation in the municipal government reorganization process to the legislative branch and the people, not the mayor.

¶ 21 Mayor Larkin argues that comparing the procedure for passing a reorganization resolution to that of amending the constitution ignores the fact that a two-thirds affirmative vote by Congress or the legislature is required to advance a proposed amendment to the United States Constitution or Utah Constitution, respectively, whereas the Holla-

day City reorganization resolution passed by a simple majority. However, this difference causes us no concern as Resolution 03–34 merely initiated an election, leaving the ultimate decision to change Holladay City's government to the electorate. Had the adoption of the resolution itself altered the form of Holladay City's government, we would share the Mayor's concern that a simple majority did not express sufficient will to bring about fundamental institutional change. Thus, we find no need to impose this requirement on a city council that wishes to pass a resolution allowing the electorate to vote on an issue.

¶ 22 Finally, we note that although the resolution passed by a vote of 3–2 and Mayor Larkin had no authority to formally disapprove the enactment of the resolution, the Mayor was nevertheless afforded ample opportunity to present his views on the resolution to the City Council and to persuade a majority of that body that the resolution was misguided and should be defeated.

## II. CONSTITUTIONALITY OF THE ELECTION STATUTES

¶ 23 We next turn to the Mayor's facial challenge to Utah Code section 20A–5–101, the "Election Notices and Instructions" section of the general election code. *See* Utah Code Ann. § 20A–5–101 (2003). Mayor Larkin alleges that this statute is unconstitutional because it fails to provide proper notice to voters, thus infringing on their fundamental right to vote in an educated manner. Mayor Larkin also argues that this statute is unconstitutional because it does not provide sufficient notice to voters who may wish to cast an absentee ballot.

¶ 24 The statute which governs the alteration of a municipal form of government does not provide for a particular process to notify voters of a reorganization election. *See id.* § 10–3–1203 (2003). In the absence of specific guidelines, any election, including the reorganization election at issue here, is governed by section 20A–5–101, the "Election Notices and Instructions" section of the general election code. The election code states that "[t]o provide the [required] notice . . . the election officer shall publish [a] notice at least two days before the election in a news-paper of general circulation common to the area or in which the election is being held." *Id.* § 20A–5–101(4). Mayor Larkin argues that two days is insufficient to properly educate the voters as to the issues in the election. He argues that the likelihood of an uninformed electorate caused by the abbreviated notice amounts to an infringement on the electorate's fundamental right to vote. This right to vote is simply stated: "Every citizen of the United States, eighteen years of age or over, who makes proper proof of residence in this state for thirty days next preceding any election, or such other period as required by law, shall be entitled to vote in the election." Utah Const. art. IV, § 2.

¶ 25 While we recognize that the right to vote is indeed fundamental, and that some notice must be provided to the voters, we long ago stated:

> The Constitution makes no provision respecting the kind of notice to be given of elections. The matter of notice is peculiarly within legislative discretion, subject only to the limitation that the notice provided shall not be so unreasonably insufficient as to do violence to the requirement of due process. Notice has been provided by the act by publication of such notice in a newspaper of general circulation printed and published in [the affected geographic area].

*Lehi City v. Meiling*, 87 Utah 237, 48 P.2d 530, 537 (1935). The same is true of the election here. The legislature has provided that two days' notice is sufficient, and we decline to hold that its judgment on this matter compromises the constitutionally protected right to vote.

¶ 26 The circumstances surrounding Holladay City's reorganization election do not cause us to question the sufficiency of the statutory notice requirement. We noted in *Meiling* that "[a]s a practical matter the notice of election will undoubtedly be given wide publicity in order that the people entitled to vote will have opportunity to voice their approval or disapproval of the proposed organization." *Id.* Although voter participation in an election may not directly correlate with an educated electorate, it certainly suggests an interested one. In Holladay City, interest was high. Voter turnout in the 2001 general election that elected Mayor

Larkin was 44.45 percent. Voter turnout in the 2003 reorganization election was 44.00 percent, indicating that notice of the election in fact reached a substantial portion of the electorate.

¶ 27 We further conclude that Mayor Larkin lacks standing to challenge the election on the grounds that absentee voters had inadequate notice. Our law on standing requires that a

> [p]laintiff must be able to show that he has suffered some distinct and palpable injury that gives him a personal stake in the outcome of the legal dispute. It is generally insufficient for a plaintiff to assert only a general interest he shares in common with members of the public at large. We will not entertain generalized grievances that are more appropriately directed to the legislative and executive branches of the state government.

*Jenkins v. Swan*, 675 P.2d 1145, 1148–49 (Utah 1983) (citations omitted). In this case, Mayor Larkin has failed to present sufficient evidence of injury which could be traced to the rules regarding absentee ballots and the general election code.

¶ 28 Finally, we note that the Mayor's argument that an initiative would have been a more appropriate way to address the question of a change in form of government is moot. Regardless of our views on the relative merits of undertaking governmental reorganization by resolution or initiative, or our concerns about statutory shortcomings in the resolution process, we are unwilling to reject the clearly expressed statutory right to commence municipal government reorganization by resolution.

¶ 29 Because the Holladay City Council properly enacted Resolution No. 03–34 and conducted a reorganization election that met all statutory and constitutional requirements, we affirm the ruling of the district court.

¶ 30 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice WILKINS, and Justice PARRISH concur in Justice NEHRING's opinion.